**E. R. SQUIBB & SONS, INC.,**
Petitioner,

v.

**Casper W. WEINBERGER, Secretary of Health, Education and Welfare, and Charles C. Edwards, Commissioner of Food and Drugs, Respondents.**

**No. 71–2138.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 18, 1973.

Decided Aug. 24, 1973.

Robert H. Becker, Kleenfeld, Kaplan & Becker, Washington, D. C., Richard M. Rosenbleeth, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for petitioner; Vincent A. Kleinfeld, Alan H. Kaplan, Robert H. Becker, Thomas O. Henteleff, Kleinfeld & Kaplan, Washington, D. C., of counsel.

Walker B. Comegys, Acting Asst. Atty. Gen., Anti-Trust Div., Gregory B. Hovendon, Dept. of Justice, Washington, D. C., for respondents; Peter Barton Hutt, Asst. Gen. Counsel, Food, Drugs, and Product Safety Div., Joanne S. Sisk, Eugene M. Pfeifer, Charles J. Raubicheck, Attys., U. S. Dept. of Health, Education and Welfare, Rockville, Md., of counsel.

Before VAN DUSEN and ADAMS, Circuit Judges, and BARLOW, District Judge.

## OPINION OF THE COURT

ADAMS, Circuit Judge:

This is an appeal from an order of the Food and Drug Administration (FDA) revoking the marketing approval previously granted for several drugs produced by E. R. Squibb & Sons, Inc. (Squibb), a major manufacturer of pharmaceuticals. The order also denied Squibb an evidentiary hearing before the FDA at which Squibb alleges it would produce substantial evidence of the safety and effectiveness of those drugs.

Consideration of the appeal was deferred with the concurrence of the parties, pending resolution by the U.S. Supreme Court of Weinberger v. Hynson, Wescott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (June 18, 1973).[1] An understanding of the bearing of *Hynson* on this case requires a brief explication of the procedures adopted for evaluating drugs offered for sale to the public.

Prior to 1962, a company desiring to market a "new drug" was required by statute to submit to the FDA evidence demonstrating that the drug was safe for its intended use.[2] In 1962 the law was amended to insure that drugs sold would not only be safe but effective as well.[3] Manufacturers of drugs that had been marketed before 1962 were given a period of time, after which they were required to prove the effectiveness of the drugs or have their certifications withdrawn.[4] The 1962 amendment directed that the NDA be revoked "if 'substantial evidence' that the drug is effective for its intended use is lacking."[5] Section 355(d) of the statute defined "substantial evidence" as:

". . . evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved. . . ."[6]

Faced with the necessity of reviewing the effectiveness of several thousand drugs that were on the market,[7] the

1. Both parties agree that Weinberger v. Hynson, Wescott & Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469 (June 18, 1973) has direct application to this appeal.

2. *See* Weinberger v. Hynson, 412 U.S. at 612, 93 S.Ct. at 2474.

3. 21 U.S.C. § 321(p)(1).

4. Certification is achieved by the FDA's approval of a "New Drug Application" (NDA).

5. 21 U.S.C. § 355(d) and (e); Weinberger v. Hynson, 412 U.S. 609, 93 S.Ct. at 2473.

6. 21 U.S.C. § 355(d).

7. Justice Douglas estimated that there were "some 4000" drugs covered by NDAs on the market, and thousands more that "manufacturers had marketed without applying to the FDA for clearance." This latter group are known as "me-toos." They are similar to or identical with drugs with effective NDAs.

FDA promulgated regulations providing for summary procedures for evaluating the drugs.[8] The companies that manufacture the drugs in question were required to submit "substantial evidence" of effectiveness. To carry out the statute's instruction that the investigations were to be "adequate and well-controlled," the FDA's regulations prescribed, with some specificity, the format and procedures to be followed in the studies submitted.[9] A submission in conformity with the FDA's regulations was considered to establish a prima facie showing of "substantial evidence" entitling a manufacturer to a hearing before the agency on the drug's asserted efficacy. Failure to conform to the standards was deemed to preclude a finding that there was substantial evidence, of effectiveness. Such a determination would result in the conclusion that there existed no disputed issue requiring a hearing, and the drug's approval would be withdrawn summarily by the FDA.

Operating pursuant to these regulations, the FDA ordered manufacturers to furnish the studies required by § 355(d) and the FDA's regulations. In response, Hynson submitted evidence of effectiveness and moved for a hearing. The FDA held that Hynson's submission was inadequate and denied the requested hearing and sought to withdraw approval. Hynson challenged this denial, alleging that its submission met the standards entitling it to a hearing, and that in any event the regulations promulgated by the FDA were improper. The Supreme Court approved the FDA regulations, but held that Hynson's submission was sufficient to warrant a hearing.[10]

As to the assault on the FDA's regulations, the Supreme Court pointed out that the administrative summary judgment procedure created by the regulations, and the standards established to determine the propriety of such a judgment, constituted an appropriate administrative interpretation of the "substantial evidence" requirement of the Act.

The Supreme Court went on to state the role of a court of appeals in reviewing orders of the FDA refusing hearings:

> "In reviewing an order of the Commissioner [of the FDA] denying a hearing, a court of appeals must determine whether the Commissioner's findings accurately reflect the study in question and if they do, whether the deficiencies he finds conclusively render the study inadequate or uncontrolled in light of the pertinent regulations." [11]

■ Squibb, like Hynson, made a submission to the FDA in support of a request for a hearing. Its request was rejected. The FDA's order denying the hearing cited shortcomings in the literature provided by Squibb to prove efficacy. To apply the standard of review articulated by the Supreme Court, we must determine the correctness of the FDA's findings that the deficiencies conclusively establish that the studies submitted by Squibb did not conform to the standards enunciated in the FDA regulations.

The material found adequate in *Hynson* is not fully described in the opinion of the Supreme Court. The Court of Appeals for the Fourth Circuit, however, provides a somewhat more detailed description.[12] A comparison of the description of the evidence provided by Hynson with Squibb's submission indicates that, in some respects, the materials proffered may be similar.

---

8. 35 Fed.Reg. 7251, amending 21 C.F.R. §§ 130.12(a)(5) and 130.14.

9. 21 CFR § 130.12(a)(5)(ii).

10. *Id.* 412 U.S. at 623, 93 S.Ct. at 2480. Although the concurring opinion of Justice Powell suggests that the discussion of the validity of the rules may have been "unnecessary to the Court's decision," 412 U.S. at 638, 93 S.Ct.

at 2487, both parties agree that the question has been conclusively settled for this appeal.

11. *Id.*

12. Hynson, Westcott & Dunning, Inc. v. Richardson, 461 F.2d 215, 221 (4th Cir. 1972), aff'd. 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (June 18, 1973).

To fulfill the directive of the Supreme Court, this Court would have to determine "whether the deficiencies [found] conclusively render the [Squibb] study inadequate." The submission in *Hynson* appears to be a matrix, or a bench-mark, against which other submissions may be assayed. However, the *Hynson* study, and its alleged shortcomings, have not been presented to this Court. Moreover, both the *Hynson* study and its critique and the Squibb study and its critique appear to be couched in terms more familiar to a scientific organization than to a court.

▇ These factors suggest that satisfactory adjudication of this appeal mandates that a meaningful comparison be made between the *Hynson* study and the Squibb study. Only on the basis of such an analysis, or a comparable evaluation, can the order of the FDA be reviewed in a thoughtful and proper fashion.

▇ In ordering the withdrawal of Squibb's products without a hearing, the FDA bottomed its action not only on an absence of substantial evidence of efficacy but also on a lack of "adequate data demonstrating safety." In this respect the case differs from *Hynson* where the question of safety did not arise.

To review the FDA's summary action based on considerations of safety, this Court must navigate in a relatively uncharted channel. The section of the regulations outlining the summary judgment procedure, 21 CFR § 130.14(b), by its language is not limited to dispositions based on efficacy.[13] Indeed, the regulation dealing with withdrawal of NDAs, 21 C.F.R. § 130.27, states clearly that the summary judgment procedure is available—implying that summary judgment is applicable for lack of effectiveness *or* lack of safety.

However, the statute [14] and the FDA's interpretive regulation [15] appear to indicate that the "substantial evidence" standard, as defined in the statute,[16] elaborated upon in the regulations,[17] and discussed in *Hynson*, is directed only to questions of efficacy.

A different standard seems to apply when questions of safety arise. The standard adopted both by the statute,[18] and the regulation [19] is not the "substantial evidence" measure.

---

13. The regulation does appear to track a portion of the statutory definition of the "substantial evidence" concept applied by the FDA to efficacy. However, the regulation states that such language is only an example of the type of data, the absence of which justifies summary judgment.

14. 21 U.S.C. § 355(e).

15. 21 CFR § 130.12(a).

16. 21 U.S.C. § 355(d).

17. CFR § 130.12(a)(5).

18. 21 U.S.C. § 355(e)(1) and (2).
"(e) The Secretary shall, after due notice and opportunity for hearing to the applicant, withdraw approval of an application with respect to any drug under this section if the Secretary finds (1) that clinical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved; (2) that new evidence of clinical experience, not contained in such application or not available to the Secretary until after such application was approved, or tests by new methods, or tests by methods not deemed reasonably applicable when such application was approved, evaluated together with the evidence available to the Secretary when the application was approved, shows that such drug is not shown to be safe for use under the conditions of use upon the basis of which the application was approved."

19. 21 CFR § 130.27(b)(1) and (2) state:
"§ 130.27 Withdrawal of approval of an application.
"The Commissioner shall, in writing, notify the person holding an approved new-drug application and afford an opportunity for a hearing on a proposal to withdraw approval of the application as provided in section 505(e) of the act and in accordance with the procedure in §§ 130.14 to 130.26, inclusive, if:
    .          .          .          .          .
"(b) The Commissioner finds:
"(1) That clinical or other experience, tests, or other scientific data show that the drug is unsafe for use under the conditions of use upon the basis of which the application was approved; or
"(2) That new evidence of clinical experience, not contained in the application or not

The safety standard was not directly involved in *Hynson*. However, the FDA order here appealed from, dealt with both efficacy and safety and did not appear to shift standards when the inquiry moved from efficacy to safety. Because *Hynson* does indicate the necessity for a remand on the issue of efficacy, and because the standard applied to determine the propriety of summary judgment on the issue of safety has not been made clear by the FDA, remand for reconsideration of that question as well appears warranted.[20]

■ Before this Court may affirm an action taken by summary judgment, it must be certain that no genuine issues as to any material facts are in dispute, that no questions remain unanswered. This principle, applicable in all summary judgment procedures, would appear to gain content when applied to the present case. If a judicial tribunal harbors a doubt about any factual issue, it may not approve a disposition by summary judgment. The information before the Court, because of the highly esoteric and scientific terms employed, does not afford us a satisfactory basis on which to affirm or reverse the FDA's summary order. Rather, the record would appear to demand amplification and clarification.

Accordingly, this case is remanded to the FDA to measure the Squibb submission against the *Hynson* submission, to apply an articulated standard on issues of safety, and to take whatever further action, if any, such proceedings dictate.

available to the Food and Drug Administration until after the application was approved, or tests by new methods, or tests by methods not deemed reasonably applicable when the application was approved, evaluated together with the evidence available when the application was approved, reveal that the drug is not shown to be safe for use under the conditions of use upon the basis of which the application was approved."

20. This Court recognizes that a finding that the drug is either unsafe or ineffective will result in the drug's removal from the market. Thus, a remand for a determination of the propriety of summary judgment on efficacy, and a finding of ineffectiveness, may well moot questions of safety. The reverse is, of course, also the case. Nonetheless, a reconsideration of the summary disposition of this matter would appear to be a sounder course.