**KRAFT, INC., Petitioner,**

v.

**FEDERAL TRADE COMMISSION,
Respondent.**

**No. 91–1691.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1992.

Decided July 31, 1992.

---

Andrew L. Frey, Kenneth S. Geller (argued), Andrew J. Pincus, Michael Vatis, Mayer, Brown & Platt, Washington, D.C., for petitioner.

Ernest J. Isenstadt, ·Melvin H. Orlans (argued), F.T.C., Washington, D.C., for respondent.

Before FLAUM and MANION, Circuit Judges, and CURRAN, District Judge.*

FLAUM, Circuit Judge.

Kraft, Inc. ("Kraft") asks us to review an order of the Federal Trade Commission ("FTC" or "Commission") finding that it violated §§ 5 and 12 of the Federal Trade Commission Act ("Act"), 15 U.S.C. §§ 45, 52. The FTC determined that Kraft, in an advertising campaign, had misrepresented information regarding the amount of calcium contained in Kraft Singles American Pasteurized Process Cheese Food ("Singles") relative to the calcium content in five ounces of milk and in imitation cheese slices. The FTC ordered Kraft to cease and desist from making these misrepresentations and Kraft filed this petition for review. We enforce the Commission's order.

## I.

Three categories of cheese compete in the individually wrapped process slice market: process cheese food slices, imitation slices, and substitute slices. Process cheese food slices, also known as "dairy slices," must contain at least 51% natural cheese by federal regulation. 21 C.F.R. § 133.173(a)(5). Imitation cheese slices, by contrast, contain little or no natural cheese and consist primarily of water, vegetable oil, flavoring agents, and fortifying agents. While imitation slices are as healthy as process cheese food slices in some nutrient categories, they are as a whole considered "nutritionally inferior" and must carry the label "imitation." *Id.* at § 101.3(e)(4). Substitute slices fit somewhere in between; they fall short of the natural cheese con-

---

* The Honorable Thomas J. Curran, District Judge of the United States District Court for the East-ern District of Wisconsin, sitting by designation.

tent of process cheese food slices yet are nutritionally superior to imitation slices. *Id.* at § 101.3(e)(2). Consistent with FTC usage, we refer to both imitation and substitute slices as "imitation" slices.

Kraft Singles are process cheese food slices. In the early 1980s, Kraft began losing market share to an increasing number of imitation slices that were advertised as both less expense and equally nutritious as dairy slices like Singles. Kraft responded with a series of advertisements, collectively known as the "Five Ounces of Milk" campaign, designed to inform consumers that Kraft Singles cost more than imitation slices because they are made from five ounces of milk rather than less expensive ingredients. The ads also focused on the calcium content of Kraft Singles in an effort to capitalize on growing consumer interest in adequate calcium consumption.

 The FTC filed a complaint against Kraft charging that this advertising campaign materially misrepresented the calcium content and relative calcium benefit of Kraft Singles. The FTC Act makes it unlawful to engage in unfair or deceptive commercial practices, 15 U.S.C. § 45, or to induce consumers to purchase certain products through advertising that is misleading in a material respect. *Id.* at §§ 52, 55. Thus, an advertisement is deceptive under the Act if it is likely to mislead consumers, acting reasonably under the circumstances, in a material respect. *Thompson Medical Co.*, 104 F.T.C. 648, 788 (1984), *aff'd*, 791 F.2d 189 (D.C.Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987), *Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 164–66 (1984); *Federal Trade Commission Policy Statement on Deception*, 103 F.T.C. 174 (1984) (appended to *Cliffdale Assocs.*) [hereinafter *"FTC Policy Statement"*]. In implementing this standard, the Commission examines the overall net impression of an ad and engages in a three-part inquiry: (1) what claims are conveyed in the ad; (2) are those claims false

or misleading; and (3) are those claims material to prospective consumers.

Two facts are critical to understanding the allegations against Kraft. First, although Kraft does use five ounces of milk in making each Kraft Single, roughly 30% of the calcium contained in the milk is lost during processing. Second, the vast majority of imitation slices sold in the United States contain 15% of the U.S. Recommended Daily Allowance (RDA) of calcium per ounce, roughly the same amount contained in Kraft Singles. Specifically then, the FTC complaint alleged that the challenged advertisements made two implied claims, neither of which was true: (1) that a slice of Kraft Singles contains the same amount of calcium as five ounces of milk (the "milk equivalency" claim); and (2) that Kraft Singles contain more calcium than do most imitation cheese slices (the "imitation superiority" claim).[1]

The two sets of ads at issue in this case, referred to as the "Skimp" ads and the "Class Picture" ads, ran nationally in print and broadcast media between 1985 and 1987. The Skimp ads were designed to communicate the nutritional benefit of Kraft Singles by referring expressly to their milk and calcium content. The broadcast version of this ad on which the FTC focused contained the following audio copy:

> *Lady (voice over):* I admit it. I thought of skimping. Could you look into those big blue eyes and skimp on her? So I buy Kraft Singles. Imitation slices use hardly any milk. But Kraft has five ounces per slice. Five ounces. So her little bones get calcium they need to grow. No, she doesn't know what that big Kraft means. Good thing I do.
>
> *Singers:* Kraft Singles. More milk makes 'em ... more milk makes 'em good.
>
> *Lady (voice over):* Skimp on her? No way.

*See* CX 62C & Z–72 (television ad); CX 62 Z–33 (print ad); Complaint ¶ 5 and Exs. A–

---

1. Because Kraft concedes that these claims, if made, are false, the second step of the afore- mentioned inquiry—whether the alleged claims are false—is not before us on appeal.

D; IDF 26, 44.[2] The visual image corresponding to this copy shows, among other things, milk pouring into a glass until it reaches a mark on the glass denoted "five ounces." The commercial also shows milk pouring into a glass which bears the phrase "5 oz. milk slice" and which gradually becomes part of the label on a package of Singles. In January 1986, Kraft revised this ad, changing "Kraft *has* five ounces per slice" to "Kraft is *made from* five ounces per slice," IDF 28; *see* CX 276F, CX 106 (emphasis added), and in March 1987, Kraft added the disclosure, "one ¾ ounce slice has 70% of the calcium of five ounces of milk" as a subscript in the television commercial and as a footnote in the print ads.

The Class Picture ads also emphasized the milk and calcium content of Kraft Singles but, unlike the Skimp ads, did not make an express comparison to imitation slices. The version of this ad examined by the FTC depicts a group of school children having their class picture taken, and contains the following audio copy:

> *Announcer (voice over):* Can you see what's missing in this picture?
> Well, a government study says that half the school kids in America don't get all the calcium recommended for growing kids. That's why Kraft Singles are important. Kraft is made from five ounces of milk per slice. So they're concentrated with calcium. Calcium the government recommends for strong bones and healthy teeth!
> *Photographer:* Say Cheese!
> *Kids:* Cheese!
> *Announcer (voice over):* Say Kraft Singles. 'Cause kids love Kraft Singles, right down to their bones.

*See* CX 275I & CX 62 Z–11 (television ad); CX 62 Z–55 (print ad); *see also* IDF 38. The Class Picture ads also included the subscript disclaimer mentioned above.

After a lengthy trial, the Administrative Law Judge (ALJ) concluded that both the Skimp and Class Picture ads made the milk equivalency claim. Specifically, the ALJ found that the juxtaposition of references to milk and calcium, along with the failure to mention that calcium is lost in processing, implied that each Kraft Single contains the same amount of calcium as five ounces of milk, and that the altered audio copy and subscript disclosure were confusing and inconspicuous and thus insufficient to dispel this impression. Further, the ALJ concluded that both sets of ads falsely conveyed the imitation superiority claim; he determined that reasonable consumers would take away the net impression that Kraft Singles contain more calcium than imitation slices because Kraft Singles contain five ounces of milk and imitation slices have little or no milk. According to the ALJ, both claims were material because they implicated important health concerns. He therefore ordered Kraft to cease and desist from making these claims about any of its individually wrapped slices of process cheese food, imitation cheese, or substitute cheese.

The FTC affirmed the ALJ's decision, with some modifications. *In re Kraft, Inc.*, FTC No. 9208 (Jan. 30, 1991). As to the Skimp ads, the Commission found that four elements conveyed the milk equivalency claim: (1) the use of the word "has" in the phrase "Kraft has five ounces per slice"; (2) repetition of the precise amount of milk in a Kraft Single (five ounces); (3) the use of the word "so" to link the reference to milk with the reference to calcium; and (4) the visual image of milk being poured into a glass up to a five-ounce mark, and the superimposition of that image onto a package of Singles. It also found two additional elements that conveyed the imitation superiority claim: (1) the express reference to imitation slices combined with the use of comparative language ("hardly any," "but"); and (2) the image of a glass containing very little milk during the reference to imitation slices, followed by the image of a glass being filled to the five-ounce mark during the reference to Kraft Singles. The Commission based all of these findings on its own impression of the advertisements and found it unnec-

---

**2.** References to the record are abbreviated as follows:

IDF—initial decision finding

CX—complaint counsel's exhibit

Tr.—transcript of testimony

essary to resort to extrinsic evidence; it did note, however, that the available extrinsic evidence was consistent with its determinations.

The Commission then examined the Class Picture ads—once again, without resorting to extrinsic evidence—and found that they contained copy substantially similar to the copy in the Skimp ads that conveyed the impression of milk equivalency. It rejected, however, the ALJ's finding that the Class Picture ads made an imitation superiority claim, determining that the ads neither expressly compared Singles to imitation slices, nor contained any visual images to prompt such a comparison, and that available extrinsic evidence did not support the ALJ's finding.

The FTC next found that the claims were material to consumers. It concluded that the milk equivalency claim is a health-related claim that reasonable consumers would find important and that Kraft believed that the claim induced consumers to purchase Singles. The FTC presumed that the imitation superiority claim was material because it found that Kraft intended to make that claim. It also found that the materiality of that claim was demonstrated by evidence that the challenged ads led to increased sales despite a substantially higher price for Singles than for imitation slices.

Finally, the FTC modified the ALJ's cease and desist order by extending its coverage from "individually wrapped slices of cheese, imitation cheese, and substitute cheese" to "any product that is a cheese, related cheese product, imitation cheese, or substitute cheese." The Commission found that the serious, deliberate nature of the violation, combined with the transferability of the violations to other cheese products, justified a broader order. Kraft filed this petition to set-aside the Commission's order or, alternatively, to modify its scope.

## II.

Our standard for reviewing FTC findings has been traditionally limited to the highly deferential, substantial evidence test. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90

L.Ed.2d 445 (1976); *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir.1986), *cert. denied*, 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987). However, Kraft argues as a threshold matter that two recent Supreme Court decisions, *Bose Corp. v. Consumers Union*, 466 U.S. 485, 510–11, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984), and *Peel v. Attorney Registration and Disciplinary Comm'n*, 496 U.S. 91, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990), compel us to review the FTC's factual findings *de novo* because they implicate Kraft's first amendment commercial speech rights.

A deferential standard in reviewing FTC findings long predates *Bose* and *Peel*. In *FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 385, 85 S.Ct. 1035, 1043, 13 L.Ed.2d 904 (1965), the Supreme Court held that while the words "deceptive advertising" set forth a legal standard that derives its final meaning from judicial construction, an FTC finding is "to be given great weight by reviewing courts" because it "rests so heavily on inference and pragmatic judgment" and in light of the frequency with which the Commission handles these cases. *Id.* at 385, 85 S.Ct. at 1043. However, *Colgate–Palmolive* preceded the extension of first amendment protection to commercial speech, *see, e.g., Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976), and subsequent cases examining the contours of that right.

*Bose* was a libel case holding that appellate courts have a constitutional responsibility to review *de novo* a lower court finding of fact that a defamatory statement was made with actual malice. *Bose*, 466 U.S. at 510–11, 104 S.Ct. at 1965. The Court declared that judges, as expositors of the Constitution, must independently decide whether evidence in the record is sufficient to strip allegedly libelous speech of first amendment protection. The Court, however, explicitly left unresolved the question of whether this higher standard of review extended to commercial speech cases. *Id.* at 504 n. 22, 104 S.Ct. at 1961 n. 22. Kraft asserts that the Court has since answered

that question. *Peel* held that a state regulation prohibiting attorneys from advertising a specialty or certification violated the first amendment and, significantly, a plurality of four Justices reviewed this issue *de novo*, *Peel*, 496 U.S. at 108, 110 S.Ct. at 2291 (citing *Bose*), while Justice Marshall, writing separately, and providing a fifth vote, apparently did so as well. *Id.* at 111–117, 110 S.Ct. at 2293–96 (concurring opinion). Thus, *Peel* arguably extended *de novo* review to another subcategory of constitutionally protected speech, commercial advertising.

Nonetheless, we decline to apply *de novo* review in this context. For one, the implications of *Bose* are not as clear as Kraft suggests, *see FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 41 n. 3 (D.C.Cir.1985) (refusing to extend *Bose* to the commercial speech context); *see also* Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum.L.Rev. 229, 244–47 (1985), and *Bose* itself suggests that commercial speech might not warrant the higher standard of review established for libel cases. *Bose*, 466 U.S. at 504 n. 22, 104 S.Ct. at 1962 n. 22 (commercial speech generally considered less susceptible to the chilling effect of state regulation than other forms of speech). Although one might argue that *Bose* and *Peel* operating in tandem effectively overrule *Colgate–Palmolive*, we do not think that the Court intended that result. *See Rodriquez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has a direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [Courts] of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."). Moreover, there are important distinctions between the sort of appellate review conducted in *Bose* and *Peel* and that

done in *Colgate–Palmolive* and this case. The former involved review of court decisions, and courts generally lack the Commission's expertise in the field of deceptive advertising. While it could be posited that it is counter-intuitive to grant more deference to the Commission than to courts, Commission findings are well-suited to deferential review because they may require resolution of "exceedingly complex and technical factual issues." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 645, 105 S.Ct. 2265, 2279, 85 L.Ed.2d 652 (1985); *see also Colgate–Palmolive*, 380 U.S. at 385, 85 S.Ct. at 1042. In addition, the determination of whether an ad has a tendency to deceive is an impressionistic one more closely akin to a finding of fact than a conclusion of law. *National Comm'n on Egg Nutrition v. FTC*, 570 F.2d 157, 161 (7th Cir.1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978); *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir.1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977).

Most important, the restriction challenged in *Peel* is a completely different animal than the one challenged here. In *Peel*, the issue was whether a prophylactic regulation applicable to all lawyers, completely prohibiting an entire category of potentially misleading commercial speech, passed constitutional muster.[3] *Peel*, 496 U.S. at 108–09, 110 S.Ct. at 2292 (plurality); *id.* at 111, 110 S.Ct. at 2293 (concurrence). Here, by contrast, the issue is whether an individualized FTC cease and desist order, prohibiting a particular set of deceptive ads, passes constitutional muster. *See Zauderer*, 471 U.S. at 645–46, 105 S.Ct. at 2279 (assessing deceptive advertising under the FTC Act a qualitatively different and more complex task than assessing the validity of a state attorney advertising regulation). We find the restriction at issue in

---

**3.** Kraft disputes this characterization of *Peel*, arguing the Supreme Court was reviewing a specific agency finding of deceptive advertising rather than the state regulation itself. While it is true that the Court examined the state regulation "as applied" to Peel, *Peel*, 496 U.S. at 107 n. 15, 110 S.Ct. at 2291 n. 15 (plurality); *id.* at 117

n. 1, 110 S.Ct. at 2296 n. 1 (concurrence), that does not change the fact that the Court was confronted with a general regulation applicable to all lawyers rather than an administrative order applicable only to a single entity, such as the one Kraft challenges here.

*Peel* and the one here sufficiently distinct to justify differing levels of appellate review. Accordingly, we decline to review *de novo* the FTC's findings and, with the substantial evidence test in mind, turn to the facts of this case.

### III.

Kraft makes numerous arguments on appeal, but its principal claim is that the FTC erred as a matter of law in not requiring extrinsic evidence of consumer deception. Without such evidence, Kraft claims (1) that the FTC had no objective basis for determining if its ads actually contained the implied claims alleged, and (2) that the FTC's order chills constitutionally protected commercial speech. Alternatively, Kraft contends that substantial evidence does not support the FTC's finding that the Class Picture ads contain the milk equivalency claim. Finally, Kraft maintains that even if it did make the alleged milk equivalency and imitation superiority claims, substantial evidence does not support the FTC's finding that these claims were material to consumers. We address each contention in turn.

### A.

#### 1.

■ In determining what claims are conveyed by a challenged advertisement, the Commission relies on two sources of information: its own viewing of the ad and extrinsic evidence. Its practice is to view the ad first and, if it is unable on its own to determine with confidence what claims are conveyed in a challenged ad, to turn to extrinsic evidence. *Thompson Medical,* 104 F.T.C. at 788–89; *Cliffdale Assocs.,* 103 F.T.C. 110, 164–66 (1984); *FTC Policy Statement,* 103 F.T.C. at 176. The most convincing extrinsic evidence is a survey "of what consumers thought upon reading the advertisement in question," *Thompson Medical,* 104 F.T.C. at 788–89, but the Commission also relies on other forms of extrinsic evidence including consumer testimony, expert opinion, and copy tests of ads. *FTC Policy Statement,* 103 F.T.C. at 176 n. 8.

Kraft has no quarrel with this approach when it comes to determining whether an ad conveys *express* claims, but contends that the FTC should be required, as a matter of law, to rely on extrinsic evidence rather than its own subjective analysis in all cases involving allegedly *implied* claims.[4] The basis for this argument is that implied claims, by definition, are not self-evident from the face of an ad. This, combined with the fact that consumer perceptions are shaped by a host of external variables—including their social and educational backgrounds, the environment in which they view the ad, and prior experiences with the product advertised, *see* Richard Craswell, *Interpreting Deceptive Advertising,* 65 B.U.L. Rev. 658, 672–74, 717 (1985); Richard Pollay, *Deceptive Advertising and Consumer Behavior: A Case for Legislative and Judicial Reform,* 17 U.Kan.L.Rev. 625, 629–31 (1969)—makes review of implied claims by a five-member commission inherently unreliable. The Commissioners, Kraft argues, are simply incapable of determining what implicit messages consumers are likely to perceive in an ad. Making matters worse, Kraft asserts that the Commissioners are predisposed to find implied claims because the claims have been identified in the complaint, rendering it virtually impossible for them to reflect the perceptions of unbiased consumers. *See* Comment, *The Use and Reliability of Survey Evidence in Deceptive Advertising Cases,* 62 Or.L.Rev. 561, 572 (1983) ("since the commissioners are highly trained attorneys with very specialized views of advertising, they lack the perspective to accurately identify the mean-

---

**4.** Express claims directly represent the fact at issue while implied claims do so in an oblique or indirect way. *Thompson Medical,* 104 F.T.C. at 788. To illustrate, consider the following. Suppose a certain automobile gets poor gas mileage, say, 10 miles per gallon. One advertisement boasts that it gets 30 miles per gallon while another identifies the car as the "Miser," depicts it rolling through the countryside past one gas station after another, and proclaims that the car is inexpensive to operate. Both ads make deceptive claims: the first does so expressly, the second does so impliedly.

ing given an advertisement by the general public").

Kraft buttresses its argument by pointing to the use of extrinsic evidence in an analogous context: cases brought under § 43(a) of the Lanham Act. 15 U.S.C. § 1125(a). Courts hearing deceptive advertising claims under that Act, which provides a private right of action for deceptive advertising, generally require extrinsic proof that an advertisement conveys an implied claim. *See, e.g., Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 386 (2d Cir.1986); *Tambrands, Inc. v. Warner–Lambert Co.*, 673 F.Supp. 1190, 1198 (S.D.N.Y.1987); *see generally* Ivan L. Preston, *False or Deceptive Advertising Under the Lanham Act: Analysis of Factual Findings and Types of Evidence*, 79 Trademark Rep. 508, 526 (1989). Were this a Lanham Act case, a reviewing court in all likelihood would have relied on extrinsic evidence of consumer perceptions. While this disparity is sometimes justified on grounds of advertising "expertise"—the FTC presumably possesses more of it than courts, *see American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 172 n. 27 (2d Cir.1978)—Kraft maintains this justification is an illusory one in that the FTC has no special expertise in discerning consumer perceptions. *See* Robert Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 Harv.L.Rev. 661, 678 (1977); Ernest Gellhorn, *Proof of Consumer Deception Before the Federal Trade Commission*, 17 U.Kan.L.Rev. 559, 564–65 (1969). Indeed, proof of the FTC's inexpertise abounds: false advertising cases makes up a small part of the Commission's workload, *see* Glen E. Weston, *Deceptive Advertising and the Federal Trade Commission: Decline of Caveat Emptor*, 24 Fed.B.J. 548, 571 (1964), most commissioners have little prior experience in advertising, *see* Paul H. LaRue, *FTC Expertise: A Legend Examined*, 16 Antitrust Bull. 1 (1971), and the average tenure of commissioners is very brief. *See* Richard A. Posner, *The Federal Trade Commission*, 37 U.Chi.L.Rev. 47, 86 (1969) (average tenure of four years). That evidence aside, no amount of exper-

tise in Kraft's view can replace the myriad of external variables affecting consumer perceptions. Here, the Commission found implied claims based solely on its own intuitive reading of the ads (although it did reinforce that conclusion by examining the proffered extrinsic evidence). Had the Commission fully and properly relied on available extrinsic evidence, Kraft argues it would have conclusively found that consumers do not perceive the milk equivalency and imitation superiority claims in the ads.

■ While Kraft's arguments may have some force as a matter of policy, they are unavailing as a matter of law. Courts, including the Supreme Court, have uniformly rejected imposing such a requirement on the FTC, *see Colgate–Palmolive*, 380 U.S. at 391–92, 85 S.Ct. at 1046 (FTC not required to conduct consumer surveys before determining that a commercial has a tendency to mislead); *National Bakers Servs., Inc. v. FTC*, 329 F.2d 365, 367 (7th Cir.1964); *Rhodes Pharmacal Co. v. FTC*, 208 F.2d 382, 387 (7th Cir.1953), *rev'd in part*, 348 U.S. 940, 75 S.Ct. 361, 99 L.Ed. 736 (1955); *Zenith Radio Corp. v. FTC*, 143 F.2d 29, 31 (7th Cir.1944); *accord Bristol–Myers Co. v. FTC*, 738 F.2d 554, 563 (2d Cir.1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 960, 83 L.Ed.2d 966 (1985); *American Home Prods. Corp. v. FTC*, 695 F.2d 681, 687 n. 10 (3d Cir.1982); *Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1146 n. 11 (9th Cir.1978); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 40–41 (D.C.Cir.1985); *Thompson Medical*, 791 F.2d at 197, and we decline to do so as well. We hold that the Commission may rely on its own reasoned analysis to determine what claims, including implied ones, are conveyed in a challenged advertisement, so long as those claims are reasonably clear from the face of the advertisement.

Kraft's case for a *per se* rule has two flaws. First, it rests on the faulty premise that implied claims are inescapably subjective and unpredictable. In fact, implied claims fall on a continuum, ranging from the obvious to the barely discernible. *Thompson Medical*, 104 F.T.C. at 788–89.

The Commission does not have license to go on a fishing expedition to pin liability on advertisers for barely imaginable claims falling at the end of this spectrum. However, when confronted with claims that are implied, yet conspicuous, extrinsic evidence is unnecessary because common sense and administrative experience provide the Commission with adequate tools to makes its findings. *See Colgate–Palmolive*, 380 U.S. at 391–92, 85 S.Ct. at 1045 (FTC need not conduct a consumer survey in finding commercial misleading); *cf. Zauderer*, 471 U.S. at 652–53, 105 S.Ct. at 2282 (implied claims that are self-evident do not require the State to conduct a public survey before finding advertisement misleading). The implied claims Kraft made are reasonably clear from the face of the advertisements, and hence the Commission was not required to utilize consumer surveys in reaching its decision.

Second, Kraft's reliance on Lanham Act decisions is misplaced. For one, not all courts applying the Lanham Act rely on extrinsic evidence when confronted with implied claims, *see, e.g., Better Business Bureau, Inc. v. Medical Directors, Inc.*, 681 F.2d 397, 403 (5th Cir.1982); *American Home Prods. v. Johnson & Johnson*, 654 F.Supp. 568, 583 (S.D.N.Y.1987), but more importantly, when they do, it is because they are ill equipped—unlike the Commission—to detect deceptive advertising. *See, e.g., Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 228 (3d Cir.1990); *Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 588 F.Supp. 1082, 1094 (S.D.N.Y.), *aff'd*, 747 F.2d 114 (2d Cir.1984). And the Commission's expertise in deceptive advertising cases, Kraft's protestations notwithstanding, undoubtedly exceeds that of courts as a general matter. That false advertising cases constitute a small percentage of the FTC's overall workload does not negate the fact that significant resources are devoted to such cases in absolute terms, nor does it account for the institutional expertise the FTC gains through investigations, rulemakings, and consent orders. The Commissioners' personal experiences quite obviously affect their perceptions, but it does not follow that they are incapable of predicting whether a particular claim is likely to be perceived by a reasonable number of consumers.

2.

The crux of Kraft's first amendment argument is that the FTC's current subjective approach chills some truthful commercial speech. Kraft acknowledges the novelty of its argument, but asserts that the issue warrants consideration in light of evolving commercial speech doctrine. Once regarded as unprotected by the first amendment, *see Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), commercial speech, as noted, has since been brought within the sphere of constitutional protection. *Virginia Pharmacy Bd.*, 425 U.S. at 770, 96 S.Ct. at 1829–30. Society has a strong interest "in the free flow of commercial information" critical to a free market economy, *id.* at 763, 96 S.Ct. at 1826, and it is this interest the first amendment vindicates in protecting commercial speech. *Brown & Williamson*, 778 F.2d at 43. However, "[f]alse, deceptive, or misleading advertising" does not serve that interest and thus this category of commercial speech "remains subject to restraint." *In re R.M.J.*, 455 U.S. 191, 200, 102 S.Ct. 929, 936, 71 L.Ed.2d 64 (1982).

Kraft contends that by relying on its own subjective judgment that an ad, while literally true, implies a false message, the FTC chills nonmisleading, protected speech because advertisers are unable to predict whether the FTC will find a particular ad misleading. Advertisers can run sophisticated pre-dissemination consumer surveys and find no implied claims present, only to have the Commission determine in its own subjective view that consumers would perceive an implied claim. Indeed, Kraft maintains that is precisely what happened here. Even more troubling, Kraft maintains that the ads most vulnerable to this chilling effect are factual, comparative ads, like the Five Ounces of Milk campaign, of greatest benefit to consumers. *See Virginia State Bd. of Pharmacy*, 425 U.S. at

763–65, 96 S.Ct. at 1826–27 (noting that the "free flow" of comparative advertising is "indispensable" to intelligent consumer decisionmaking). The net result of the Commission's subjective approach will be an influx of soft "feel good" ads designed to avoid unpredictable FTC decisions. *See* Richard M. Schmidt, Jr. & Robert C. Burns, *Proof or Consequences: False Advertising and the Doctrine of Commercial Speech*, 56 U.Cin.L.Rev. 1273, 1293 (1988); Note, *The Risk of Chill: A Cost of the Standards Governing the Regulation of False Advertising Under Section 43(a) of the Lanham Act*, 77 Va.L.Rev. 339, 349 (1991). The way to avoid this chilling effect, according to Kraft, is to require the Commission to rely on objective indicia of consumer perceptions in finding implied claims.

■ Kraft's first amendment challenge is doomed by the Supreme Court's holding in *Zauderer*, which established that no first amendment concerns are raised when facially apparent implied claims are found without resort to extrinsic evidence. *See Zauderer*, 471 U.S. at 652–53, 105 S.Ct. at 2282; *accord American Home*, 695 F.2d at 688 n. 10. In *Zauderer*, a lawyer advertised that clients who retained him on a contingent-fee basis would not have to pay *legal fees* if their lawsuits were unsuccessful, without disclosing that these clients would be charged for *costs*, even though these are terms of art unknown to most laypersons; thus, the ad implied that hiring this lawyer was a no-lose proposition to potential clients. The state sanctioned Zauderer for engaging in misleading advertising, and he challenged that sanction on first amendment grounds. In approving the state's action, the Supreme Court declared, "When the possibility of deception is as self-evident as it is in this case, we need not require the State to 'conduct a survey of the ... public before it [may] determine that the [advertisement] had a tendency to mislead.'" *Zauderer*, 471 U.S. at 652–53, 105 S.Ct. at 2282 (quoting *Colgate–Palmolive*, 380 U.S. at 391–92, 85 S.Ct. at 1046).

Thus, *Zauderer* teaches that consumer surveys are not compelled by the first amendment when the alleged deception although implied, is conspicuous. In both *Zauderer* and here, an omitted piece of information—the definition of a key contractual term in *Zauderer*, the effect of processing on nutrient content here—led to potential consumer deception, and in both cases the ads were literally true, yet impliedly misleading. Kraft's implied claims were reasonably clear from the face of the ads and not unpredictable to Kraft. Our conclusion is strengthened by the fact that commercial speech is generally considered less susceptible to the chilling effect of regulation than other, more traditionally recognized forms of speech, such as political discourse. *See Bose*, 466 U.S. at 504 n. 22, 104 S.Ct. at 1961–62 ("danger [minimal] that governmental regulation of false or misleading ... product advertising will chill accurate and non-deceptive commercial expression"); *Bates v. State Bar of Arizona*, 433 U.S. 350, 383, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810 (1977). Because we conclude that the Commission was not required to rely on extrinsic evidence, we need not examine the extrinsic evidence proffered by Kraft that it says contravenes the Commission's findings. We note, however, that the Commission did thoroughly examine this evidence, albeit after the fact, and found that it did not refute the implied claim findings and that some of the evidence was based on unsound consumer testing methodologies.

Our holding does not diminish the force of Kraft's argument as a policy matter, and, indeed, the extensive body of commentary on the subject makes a compelling argument that reliance on extrinsic evidence should be the rule rather than the exception. Along those lines, the Commission would be well-advised to adopt a consistent position on consumer survey methodology—advertisers and the FTC, it appears, go round and round on this issue—so that any uncertainty is reduced to an absolute minimum.

### B.

■ Alternatively, Kraft argues that substantial evidence does not support the

FTC's finding that the Class Picture ads convey a milk equivalency claim. (Recall that the FTC, unlike the ALJ, concluded that the Class Picture ads did not contain the imitation superiority claim, leaving only the milk equivalency finding on appeal.) Kraft claims that the Commission merely extrapolated its analysis from the Skimp ads to the Class Picture ads without considering significant differences between the two. The Commission stated, for example, that the Class Picture ads "contain copy elements substantially similar to the 'Skimp' ad elements that convey the impression of milk equivalency." *In re Kraft, Inc.*, FTC No. 9208, slip op. at 22. Kraft points out that the Class Picture ads contain only one of the four elements of the Skimp ads—the reference to five ounces of milk juxtaposed with a reference to calcium content—that contributed to the FTC's milk equivalence finding. And Kraft adds that the reference to five ounces of milk per slice and to calcium merely states that each slice has a large amount of calcium because of its milk content, a completely true inference. The ads do not state or imply that each slice actually *contains* five ounces of milk or its calcium equivalent. Indeed, Kraft asserts that no reasonable consumer could think that a ¾ ounce of slice of cheese contains five ounces of milk.

We find substantial evidence in the record to support the FTC's finding. Although Kraft downplays the nexus in the ads between milk and calcium, the ads emphasize visually and verbally that five ounces of milk go into a slice of Kraft Singles; this image is linked to calcium content, strongly implying that the consumer gets the calcium found in five ounces of milk. The fact that the Commission listed four elements in finding an implied claim in the Skimp ads does not mean that those same elements must all be present in the Class Picture ad to reach that same conclusion. Furthermore, the Class Picture ads contained one other element reinforcing the milk equivalency claim, the phrase "5 oz. milk slice" inside the image of a glass superimposed on the Singles package, and it was reasonable for the Commission to conclude that there were important similarities between these two ads. Finally, to support its own interpretation of the ads, the Commission examined available extrinsic evidence and this evidence, in the Commission's view, bolstered its findings.

Kraft asserts that the literal truth of the Class Picture ads—they *are* made from five ounces of milk and they *do* have a high concentration of calcium—makes it illogical to render a finding of consumer deception. The difficulty with this argument is that even literally true statements can have misleading implications. *See Zauderer*, 471 U.S. at 652, 105 S.Ct. at 2282; *see also Thompson Medical*, 791 F.2d at 197; *Removatron Int'l Corp.*, 111 F.T.C. 206, 292–95 (1988), *aff'd*, 884 F.2d 1489 (1st Cir. 1989); *American Home Prods.*, 695 F.2d at 687. Here, the average consumer is not likely to know that much of the calcium in five ounces of milk (30%) is lost in processing, which leaves consumers with a misleading impression about calcium content. The critical fact is not that reasonable consumers might believe that a ¾ ounce slice of cheese actually contains five ounces of *milk*, but that reasonable consumers might believe that a ¾ ounce slice actually contains ·the *calcium* in five ounces of milk.

## C.

Kraft next asserts that the milk equivalency and imitation superiority claims, even if made, are not material to consumers. A claim is considered material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product." *Cliffdale Assocs.*, 103 F.T.C. at 165; *FTC Policy Statement*, 103 F.T.C. at 175, 182. The Commission is entitled to apply, within reason, a presumption of materiality, *Colgate–Palmolive*, 380 U.S. at 392, and it does so with three types of claims: (1) express claims; (2) implied claims where there is evidence that the seller intended to make the claim; and (3) claims that significantly · involve health, safety, or other areas with which reasonable consumers would be concerned. *Thompson Medical*, 104 F.T.C. at 816–17;

*FTC Policy Statement,* 103 F.T.C. at 182–83. Absent one of these situations, the Commission examines the record and makes a finding of materiality or immateriality. *Id.*

Here, the ALJ concluded that both claims were presumptively material because calcium is a significant health concern to consumers. The Commission upheld this conclusion, although it applied a presumption of materiality only to the imitation superiority claim. Kraft asserts the Commission's determination is not supported by substantial evidence. We disagree.

■ In determining that the milk equivalency claim was material to consumers, the FTC cited Kraft surveys showing that 71% of respondents rated calcium content an extremely or very important factor in their decision to buy Kraft Singles, and that 52% of female, and 40% of all respondents, reported significant personal concerns about adequate calcium consumption. The FTC further noted that the ads were targeted to female homemakers with children and that the 60 milligram difference between the calcium contained in five ounces of milk and that contained in a Kraft Single would make up for most of the RDA calcium deficiency shown in girls aged 9–11. Finally, the FTC found evidence in the record that Kraft designed the ads with the intent to capitalize on consumer calcium deficiency concerns.

Significantly, the FTC found further evidence of materiality in Kraft's conduct: despite repeated warnings, Kraft persisted in running the challenged ads. Before the ads even ran, ABC television raised a red flag when it asked Kraft to substantiate the milk and calcium claims in the ads. Kraft's ad agency also warned Kraft in a legal memorandum to substantiate the claims before running the ads. Moreover, in October 1985, a consumer group warned Kraft that it believed the Skimp ads were potentially deceptive. Nonetheless, a high-level Kraft executive recommended that the ad copy remain unaltered because the "Singles business is growing for the first time in four years due in large part to the copy." CX 63B; IDF 191. Finally, the

FTC and the California Attorney General's Office independently notified the company in early 1986 that investigations had been initiated to determine whether the ads conveyed the milk equivalency claims. Notwithstanding these warnings, Kraft continued to run the ads and even rejected proposed alternatives that would have allayed concerns over their deceptive nature. From this, the FTC inferred—we believe, reasonably—that Kraft thought the challenged milk equivalency claim induced consumers to purchase Singles and hence that the claim was material to consumers. *See Cliffdale Associates,* 103 F.T.C. at 165; *FTC Policy Statement,* 103 F.T.C. at 175, 182.

■ With regard to the imitation superiority claim, the Commission applied a presumption of materiality after finding evidence that Kraft intended the challenged ads to convey this message. (Recall that intent to convey a claim is one of three categories qualifying for a presumption of materiality. *See, e.g., Thompson Medical,* 104 F.T.C. at 816–17.) It found this presumption buttressed by the fact that the challenged ad copy led to increased sales of Singles, even though they cost 40 percent more than imitation slices. Finally, the FTC determined that Kraft's consumer surveys were insufficient to rebut this inference and in particular criticized Kraft's survey methodology because it offered limited response options to consumers.

Kraft asserts that neither materiality finding is supported by substantial evidence. It contends that the survey evidence on which the Commission relied shows only that calcium, not milk equivalency, is important to consumers. Materiality, Kraft maintains, turns on whether the claim *itself,* rather than the *subject matter* of the claim, affects consumer decision-making; accordingly, the Commission had to show that consumers would have acted differently with knowledge that Singles contain 70% rather than 100% of the calcium in five ounces of milk. *See FTC Policy Statement,* 103 F.T.C. at 175 (claim is material if it is "likely to affect the consumer's conduct or decision with regard

to a product"). With the inquiry defined in this manner, the only relevant evidence on point—a Kraft consumer survey showing that 1.7% of respondents would stop buying Singles if informed of the effect of processing on calcium content—definitively disproves materiality. With regard to its conduct, Kraft argues it persisted in running the ads because it thought the ads *as a whole,* not the milk equivalency claim *per se,* contributed to increased sales and that, in any event, it responded to warnings by making a good faith attempt to modify the ads. Kraft repeats these arguments in attacking the FTC's finding that imitation superiority claim was material to consumers, claiming the evidence adduced showed only that Kraft intended to use the ads to differentiate Singles from imitation slices based on *milk* content, and not on *calcium* content, and that sales increased as a result of this general theme; inferring that the imitation superiority claim contributed to increased sales is pure conjecture.

Kraft's arguments lack merit. The FTC found solid evidence that consumers placed great importance on calcium consumption and from this reasonably inferred that a claim quantifying the calcium in Kraft Singles would be material to consumers. It rationally concluded that a 30% exaggeration of calcium content was a nutritionally significant claim that would affect consumer purchasing decisions. This finding was supported by expert witnesses who agreed that consumers would prefer a slice of cheese with 100% of the calcium in five ounces of milk over one with only 70%. *See* Tr. 1176–78 (Stewart); Tr. 3663–64 (Jacoby). Likewise, the materiality presumption applied to the imitation superiority claim was supported by substantial evidence. This finding rested on internal company documents showing that Kraft designed the ads to deliver an imitation superiority message. *See* CX 32B, 120, 122A, 4S. Although Kraft produced a study refuting this finding, the Commission discounted that study after finding its methodology flawed. Kraft concedes that the Skimp ads increased sales of Singles, but contends that the Commission cannot carry its burden of demonstrating a linkage be-

tween the ads and the imitation superiority claim *per se.* However, this increase in sales corresponded directly with the ad campaign and indisputably reversed that sagging sales and market share of Kraft Singles that had been attributed to competition from imitation slices. Moreover, Kraft's increase in market share came at a time when Singles were priced roughly 40% higher than imitation slices. Thus, the Commission reasonably inferred that the imitation superiority message, as a central theme in the ads, contributed to increased sales and market share.

## IV.

The Commission's cease and desist order prohibits Kraft from running the Skimp and Class Picture ads, as well as from advertising any calcium or nutritional claims not supported by reliable scientific evidence. This order extends not only to the product contained in the deceptive advertisements (Kraft Singles), but to all Kraft cheeses and cheese-related products, which include Cracker Barrel, Velveeta, and Philadelphia Brand Cream Cheese. Kraft contends this order is too broad and must be set-aside or modified because it (1) bans constitutionally protected commercial speech, and (2) is not rationally related to Kraft's violation of the Act.

## A.

First amendment infirmities arise, according to Kraft, from the sweep of the order: by banning commercial speech that is only *potentially* misleading, the order chills some non-deceptive advertising deserving of constitutional protection. Kraft acknowledges that sweeping bans of this variety comport with traditional FTC practice, *see, e.g., Cliffdale Assocs.,* 103 F.T.C. at 165, and have been repeatedly upheld against first amendment challenges in the past. *See Bristol–Myers Co.,* 738 F.2d at 562; *Jay Norris, Inc. v. FTC,* 598 F.2d 1244, 1251 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979); *National Comm'n on Egg Nutrition,* 570 F.2d at 163; *American Home Prods.,* 695

F.2d at 688 n. 10; *Sears Roebuck & Co. v. FTC*, 676 F.2d 385, 399–400 (9th Cir.1982); *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 373–74 (9th Cir.1982); *Brown & Williamson Tobacco Corp.*, 778 F.2d at 40–41. It nonetheless again relies on the Supreme Court's recent decision in *Peel*, 496 U.S. 91, 110 S.Ct. 2281, 110 L.Ed.2d 83 (plurality); *id.* at 111, 110 S.Ct. at 2293 (concurrence), in attacking the FTC's order.

Peel was sanctioned by the State of Illinois for advertising on his letterhead that he was a certified trial specialist, which violated a state regulation prohibiting lawyers from advertising any certifications or specialties. The Court first concluded that Peel's advertisement was only *potentially* misleading (some consumers might incorrectly assume that this was a state-sanctioned certification), not *inherently* misleading, *compare Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (door-to-door solicitation of legal services inherently misleading), and that only the latter can be categorically banned by the state. *Peel*, 496 U.S. at 108–110 & n. 17, 110 S.Ct. at 2292 & n. 17 (plurality); *id.* at 111, 110 S.Ct. at 2293 (concurrence). Restrictions on potentially misleading speech, by contrast, can be no "broader than reasonably necessary to prevent the [deception]" and may not categorically prohibit such speech if less restrictive alternatives are available. *Id.* at 107–108, 110 S.Ct. at 2291 (citing *In re R.M.J.*, 455 U.S. at 203, 102 S.Ct. at 937). Because such alternatives were available to Illinois (*e.g.*, a disclosure requirement), the Court held that this categorical ban violated the first amendment, *Peel*, 496 U.S. at 108–110 & n. 17, 110 S.Ct. at 2292 & n. 17 (plurality); *id.* at 111–12, 110 S.Ct. at 2293 (concurrence), and added that the burden was on the state, not the advertiser, to come up with a less restrictive regulation. *Id.* at 109–11, 110 S.Ct. at 2292–93 (plurality) (state must draft a narrower regulation to correct potential consumer and Peel may continue using letterhead in the interim); *id.* at 117, 110 S.Ct. at 2296 (concurrence).

Kraft asserts that its advertisements are only potentially misleading, like the letterhead statement in *Peel*, because the milk equivalency and imitation superiority claims are true and verifiable, there is no evidence that these claims actually misled consumers, and the advertising medium is not inherently conducive to deception. Alternative remedial measures were readily available to the Commission, such as modifications to the ads or prominent disclosures, and thus, Kraft contends, the order is broader than reasonably necessary to prevent deception. Moreover, Kraft asserts the order put the onus on it to come up with nonmisleading alternatives in contravention of *Peel*.

We reject Kraft's argument. To begin with, the Commission determined that the ads were *actually* misleading, not *potentially* misleading, thus justifying a total ban on the challenged ads. *See Peel*, 496 U.S. at 100, 110 S.Ct. at 2287 ("[m]isleading advertising may be prohibited entirely"). Moreover, even if we were to assume the order bans some potentially misleading speech, it is only constitutionally defective if it is no "broader than reasonably necessary to prevent the [deception]." *Id.* at 107, 110 S.Ct. at 2291. We conclude that it is sufficiently narrow to pass constitutional muster. Unlike the prophylactic regulation in *Peel*, which banned an entire category of commercial speech, the restriction at issue here is an administrative cease and desist order directed toward one company's cheese ads and predicated on a specific finding of past deceptive practices.

■■ To reiterate, the FTC's order does two things: it prohibits the Skimp ads and the Class Picture ads (as *currently* designed) and it requires Kraft to base future nutrient and calcium claims on reliable scientific evidence. Kraft mischaracterizes the decision as a categorical ban on commercial speech when in fact it identifies with particularity two nutrient claims that the Commission found actually misleading and prohibits only those claims. It further places on Kraft the (minor) burden of supporting future nutrient claims with reliable data. This leaves Kraft free to use any advertisement it chooses, including the Skimp and Class Picture ads, so long as it either eliminates the elements specifically

identified by the FTC as contributing to consumer deception or corrects this inaccurate impression by adding prominent, unambiguous disclosures. *See, e.g., Removatron,* 884 F.2d at 1497. We note one additional consideration further alleviating first amendment concerns; Kraft, like any party to an FTC order, may seek an advisory opinion from the Commission as to whether any future advertisements comply with its order, 16 C.F.R. § 2.41(d), and this procedure has been specifically cited by courts as one method of reducing advertiser uncertainty. *See Colgate–Palmolive,* 380 U.S. at 394, 85 S.Ct. at 1047–48; *Jay Norris,* 598 F.2d at 1251; *National Comm'n on Egg Nutrition,* 570 F.2d at 163; *Fedders Corp. v. FTC,* 529 F.2d 1398, 1404 (2d Cir.), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976).

For these reasons, we hold that the specific prohibitions imposed on Kraft in the FTC's cease and desist order are not broader than reasonably necessary to prevent deception and hence not violative of the first amendment. We wish to reemphasize the limits of this order to assuage any fears Kraft might have about compliance. The *subject* of Kraft's ads (*i.e.,* the milk and calcium content of Singles) is obviously a perfectly legitimate subject of commercial advertising. It is only the *manner* of presentation that needs rectification. Kraft is free to continue advertising the milk and calcium content in its cheese products, and it can avoid future violations by correcting the misleading elements identified in the FTC's decision. Kraft could, for example, redesign the Skimp and Class Picture ads so that calcium content is accurately presented (*i.e.,* "each Kraft Single contains the calcium equivalent of 3.5 ounces of milk") or it could add prominent, unambiguous disclosures about calcium loss in processing, either of which would put it in full compliance with the order.

### B.

Alternatively, Kraft argues that the scope of the order is not "reasonably related" to Kraft's violation of the Act because it extends to products that were not the subject of the challenged advertisements. The FTC has discretion to issue multi-product orders, so-called "fencing-in" orders, that extend beyond violations of the Act to prevent violators from engaging in similar deceptive practices in the future. *Colgate–Palmolive,* 380 U.S. at 395, 85 S.Ct. at 1048; *Sears,* 676 F.2d at 391–92. Such an order must be sufficiently clear that it is comprehensible to the violator, and must be "reasonably relat[ed]" to a violation of the Act. *Colgate–Palmolive,* 380 U.S. at 394–95, 85 S.Ct. at 1048. Kraft does not challenge the order's clarity or precision but only its reasonableness.

In determining whether a broad fencing-in order bears a "reasonable relationship" to a violation of the Act, the Commission considers (1) the deliberateness and seriousness of the violation, (2) the degree of transferability of the violation to other products, and (3) any history of prior violations. *Thompson Medical,* 104 F.T.C. at 883; *see also Sears,* 676 F.2d at 391–92. Here, the ALJ found that Kraft had not engaged in a long-term pattern of deceptive advertising, and that this was an isolated incident in response to significant competitive pressures on Kraft; hence, the ALJ opted for a narrow order. The FTC disagreed; it concluded that Kraft's violations were serious, deliberate, and easily transferable to other Kraft products, thus warranting a broad fencing-in order.

We find substantial evidence to support the scope of the order. The Commission based its finding of seriousness on the size ($15 million annually) and duration (two and one-half years) of the ad campaign and on the difficulty most consumers would face in judging the truth or falsity of the implied calcium claims. Although Kraft disputes the Commission's $15 million figure, arguing it covers many non-deceptive or unchallenged advertisements, that does not obviate the fact that this was an expensive, nationwide campaign with highly effective results. Moreover, the FTC properly found that it is unreasonable to expect most consumers to perform the calculations necessary to compare the calcium content of Kraft Singles with five ounces of

milk given the fact that the nutrient information on milk cartons is not based on a five ounce serving.

As noted previously, the Commission also found that Kraft's conduct was deliberate because it persisted in running the challenged ad copy despite repeated warnings from outside sources that the copy might be implicitly misleading. *See Thompson Medical,* 104 F.T.C. at 834–35. Kraft challenges this finding, arguing it responded to these warnings by acting in good faith to modify the ads, and further that it commissioned a post-dissemination survey to determine whether the complaints had any merit. This survey found that only an insignificant percentage of respondents detected the alleged claims. We reject these contentions. The deceptive claims were apparent from the face of the ad, but even if they somehow eluded Kraft, the Commission reasonably concluded that the steady stream of warnings should have put Kraft on notice that its surveys were somehow inadequate or defective. Kraft made three modifications to the ads, but two of them were implemented at the very end of the campaign, more than two years after it had begun. This dilatory response provided a sufficient basis for the Commission's conclusion.

The Commission further found that the violations were readily transferable to other Kraft cheese products given the general similarity between Singles and other Kraft cheeses. Kraft contends that the FTC cited no evidence to support this finding of transferability and therefore placed the burden on Kraft to show lack of transferability to other products in violation of the Administrative Procedure Act, 5 U.S.C. § 556(d), and the FTC's own regulations. 16 C.F.R. § 3.43(a); *see also Ger–Ro–Mar, Inc. v. FTC,* 518 F.2d 33, 36 (2d Cir.1975). We conclude that the FTC's finding of transferability was also reasonable. Kraft's other cheeses contain calcium and Kraft failed to provide any evidence to justify excepting these products from the order. This did not shift the burden to Kraft but merely recognized that counsel for the FTC presented a *prima facie* case

for a fencing-in order and that Kraft failed to rebut this particular point.

Finally, the FTC concluded that these factors outweighed Kraft's lack of prior violations. Kraft maintains that the Commission simply brushed aside its clean record even though prior violations are highly probative of propensity to commit future violations. This contention is also without merit because it is the circumstances of the violation as a whole, and not merely the presence or absence of any one of factor, that justifies a broad order. *See Porter & Dietsch, Inc. v. FTC,* 605 F.2d 294, 304–05 (7th Cir.1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980); *Sears, Roebuck & Co.,* 676 F.2d at 392. Hence, the FTC reasonably concluded that the seriousness, deliberateness, and transferability of the violations took precedence over the absence of any prior Kraft violations.

## V.

For the foregoing reasons, Kraft's petition to set-aside the order is DENIED and the Commission's order is ENFORCED.

MANION, concurring.

While I concur with the opinion of the court, I am concerned that the FTC can avoid extrinsic evidence by simply concluding that a deceptive, implied claim is facially apparent. While the FTC has expertise, consumer surveys provide at least some objective determination of what the purchaser thinks and should be considered since, after all, the consumer is among those we are trying to protect.

Moreover, the FTC's current procedure threatens to chill nonmisleading, protected speech. Although not all commercial speech has constitutional protection, the law has developed since this court decided that the FTC could rely on its own interpretation of ads in *National Bakers Serv., Inc. v. FTC,* 329 F.2d 365, 367 (7th Cir. 1964), *Rhodes Pharmacal Co. v. FTC,* 208 F.2d 382, 387 (7th Cir.1953), *rev'd in part* 348 U.S. 940, 75 S.Ct. 361, 99 L.Ed. 736 (1955), and *Zenith Radio Corp. v. FTC,* 143 F.2d 29, 31 (7th Cir.1944). The Supreme

Court has recognized that a free flow of information is indispensible to decisionmaking in the free enterprise system. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). But the FTC jeopardizes this flow by relying on the FTC commissioners' subjective interpretation to determine whether an ad, while literally true, implies a false message. Advertisers will be unable to predict whether the FTC will find particular ads misleading. Pre-dissemination surveys showing consumers *are not* misled will be useless since the FTC is free to ignore any such extrinsic evidence and rely on its subjective judgment that consumers *may* be misled. Advertisers unwilling to gamble with a multi-million dollar ad campaign have essentially two choices: (1) submit every campaign to the FTC in advance or (2) disseminate ads that say little or nothing about a product or service. An advertiser will not want to risk producing comparative ads which the FTC may ultimately find to imply false, unintended messages.

In this case, the panel's opinion correctly concludes that *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) controls the extrinsic evidence issue. The Supreme Court did determine that consumer surveys are not compelled by the first amendment when the "possibility of deception is as self-evident as it is in [*Zauderer*]." *Id.* 471 U.S. at 652, 105 S.Ct. at 2282. In both this case and *Zauderer*, an omitted piece of information led to an implication which turned an ad that was literally true into a potentially deceiving ad. But it is impor-. tant to note that neither this case nor *Zauderer* gives the FTC leave to ignore extrinsic evidence in every case.

Unfortunately, judicial groping for a distinction between cases where extrinsic evidence is necessary and those where it is not is leaving both advertisers and the FTC uncertain. All *Zauderer* tells them is that extrinsic evidence is not needed when the "possibility of deception is as self-evident as it is in [*Zauderer*]." *Id.* All this court tells them is that the FTC need not rely on

such evidence if the "implied claims [are] reasonably clear from the face of the ads and not unpredictable." Op. at 321. Rather than leaving judges to hew the contours of this issue, the FTC would be well-advised to take this court's suggestion—apply its expertise and develop a consumer survey methodology that advertisers can use to ascertain whether their ads contain implied, deceptive messages.